[No. A021608. First Dist., Div. Three. Jan. 14, 1986.]

CNA CASUALTY OF CALIFORNIA, Plaintiff and Appellant, v. SEABOARD SURETY COMPANY et al., Defendants and Appellants.

**COUNSEL**

Raymond C. Oleson for Plaintiff and Appellant.

Graydon S. Staring, Thomas R. Dean, Gail M. Heckemeyer, Lillick McHose & Charles, Eric C. Bettelheim, John H. O'Reilly, Laurene A. Wheeler, Barfield, Barfield, Dryden & Ruane, Marvin A. Jacobs and Jay R. Mayhall for Defendants and Appellants.

## OPINION

**BARRY-DEAL, J.**—This appeal raises important issues regarding the extent of the responsibility of insurance carriers to provide their insured with a defense. Seaboard Surety Company (Seaboard), Insurance Company of North America (INA), and Pacific Indemnity Company (Pacific) (collectively appellants) appeal from a judgment ordering them under principles of equitable contribution to pay respondent and cross-appellant CNA Casualty of California (CNA) a portion of the legal expenses incurred by CNA in defending a lawsuit against their insured, Western States Bankcard Association (WSBA). We affirm the judgment.

Appellants argue that their insurance policies could not be construed to provide coverage for any of the causes of action alleged in the underlying antitrust complaint against WSBA, WSBA had no reasonable expectation of coverage under any of the subject policies, and they therefore had no duty to defend WSBA; that particular limitations and exclusions on the policies entitled appellants to refuse to defend WSBA; and that WSBA's failure to disclose the underlying claims at the time it took out the subject insurance policies exonerated appellants from any obligation to defend WSBA and barred CNA, as subrogee, from obtaining any contribution for that defense. In addition, Pacific contends that the evidence failed to establish that it had issued an insurance policy of the kind found by the trial court; that it was absolved from any duty to defend WSBA both by CNA's failure to tender a formal demand that Pacific share in that defense and by WSBA's failure to notify Pacific of threats of litigation occurring after issuance of Pacific's policy; and that CNA was not entitled to any defense costs incurred after the trial below.

CNA has cross-appealed from the judgment, contending that the trial court's method of apportioning the parties' individual contributions to the costs of defense was not equitable, and that CNA itself was entitled to

receive its own attorneys' fees incurred in this action for equitable contribution.

I

In 1966, a number of major California banks formed WSBA to act as the regional clearinghouse for the Master Charge credit card system. Beginning in 1966 and continuing through 1977, Marsh & McLellan, Inc., insurance brokers, obtained for WSBA an extensive insurance program involving several insurance policies issued by a number of insurance companies. Among these insurance companies were appellants. The comprehensive general liability insurance policy of Pacific covered the period from 1966 to 1969; that of INA was for the period from 1969 to 1975; and CNA picked up the coverage in 1975. The Seaboard policy, which had a somewhat different focus of coverage, ran concurrently with the others from January 1967 to October 1977.

On March 21, 1977, Electronic Currency Corporation and Melvin Salveson filed suit in federal district court against WSBA, alleging an antitrust cause of action for violation of the Sherman and Clayton Acts and a second cause of action for intentional interference with contractual relationships (*Electronic Currency Corporation et al.* v. *Western States Bankcard Association et al.* (N.D.Cal.) No. C-772077-SW [the Salveson lawsuit]). An amended complaint was filed on March 3, 1978. On May 24, 1978, the federal district judge dismissed the pendent second cause of action for lack of federal subject matter jurisdiction.

WSBA tendered the defense of the amended complaint to INA, Pacific, and CNA on July 10, 1978, and to Seaboard on October 2, 1978. INA, Seaboard and Pacific declined to undertake WSBA's defense. CNA, however, accepted the tender of defense. CNA incurred a major portion of defense costs, amounting to nearly $150,000 as of October 15, 1979. It then filed the present declaratory relief action on December 18, 1979, seeking contribution from appellants for the costs incurred in defending WSBA in the federal action.

On May 7, 1981, the federal court granted summary judgment for WSBA on the remaining antitrust cause of action in the Salveson lawsuit. Two months later, in July 1981, the instant action came to trial. On December 30, 1982, the trial court filed a statement of decision finding that appellants all had a duty to defend WSBA in the Salveson lawsuit; and it entered judgment ordering appellants to reimburse CNA for its post-tender costs of

defense in the ratio that appellants' separate policy limits bear to the total limits of all four policies.

## II

All the appellants join in arguing that the Salveson lawsuit against WSBA was purely a federal antitrust action, that their respective insurance policies do not provide coverage for such an action, and that they therefore had no duty to defend WSBA. We disagree.

■ The duty to defend is much broader than the duty to indemnify. An insurer's duty to defend must be analyzed and determined on the basis of any *potential* liability arising from facts available to the insurer from the complaint or other sources available to it at the time of the tender of defense. If the insurer is obliged to take up the defense of its insured, it must do so as soon as possible, both to protect the interests of the insured, and to limit its own exposure to loss. Unlike the duty to indemnify, which is only determined after liability is finally established, the duty to defend must be assessed at the outset of the case. (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275-277 [54 Cal.Rptr. 104, 419 P.2d 168]; *Central Mutual Ins. Co.* v. *Del Mar Beach Club Owners Assn.* (1981) 123 Cal.App.3d 916, 927-928 [176 Cal.Rptr. 895]; *Fresno Economy Import Used Cars, Inc.* v. *United States Fid. & Guar. Co.* (1977) 76 Cal.App.3d 272, 278-279 [142 Cal.Rptr. 681]; *Mullen* v. *Glens Falls Ins. Co.* (1977) 73 Cal.App.3d 163, 173-174 [140 Cal.Rptr. 605].) Thus, we are not dealing with the question of whether the insurers were actually liable to indemnify WSBA for the wrongs alleged in the Salveson lawsuit, but rather with their duty to defend WSBA against Salveson's claims as of the time that lawsuit was filed. This distinction is critical.[1]

---

[1] "The duty to defend is, of course, broader than the duty to indemnify. [Citation.] Where there is doubt as to whether the duty to defend exists, the doubt should be resolved in favor of the insured and against the insurer. [Citations.]" (*Eichler Homes, Inc.* v. *Underwriters at Lloyd's, London* (1965) 238 Cal.App.2d 532, 538 [47 Cal.Rptr. 843].) "The rule is well established that an insurer's obligation to defend is broader than its duty to indemnify. [Citations.] The duty of an insurer to indemnify is determined, measured, and limited by the terms of the insurance contract [citation], and depends upon an ultimate adjudication of coverage. [Citation.] In contrast, the duty of an insurer to defend depends upon the facts known to the insurer at the inception of the third party's suit against its insured. 'An insurer . . . bears a duty to defend its insured whenever it ascertains facts which give rise to the *potential* of liability under the policy.' [Citations.]" (*Walters* v. *Marler* (1978) 83 Cal.App.3d 1, 28 [147 Cal.Rptr. 655], italics added by the *Walters* court, disapproved on other grounds in *Gray* v. *Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 507 [198 Cal.Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763].) "[T]he duty to defend is broader than the obligation to indemnify. This results from the difficulty in determining whether the third party suit falls within the indemnification coverage before the suit is resolved. To solve this

■ The insurer's obligation to defend is not dependent on the facts contained in the complaint alone; the insurer must furnish a defense when it learns of facts from *any* source that create the potential of liability under its policy. (*Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d at pp. 275-277; *Giddings* v. *Industrial Indemnity Co.* (1980) 112 Cal.App.3d 213, 217 [169 Cal.Rptr. 278]; *Mullen* v. *Glens Falls Ins. Co., supra,* 73 Cal.App.3d at pp. 169-170; *Fireman's Fund Ins. Co.* v. *Chasson* (1962) 207 Cal.App.2d 801, 804-805, 807 [24 Cal.Rptr. 726].) Indeed, the duty to defend is so broad that as long as the complaint contains language creating the potential of liability under an insurance policy, the insurer must defend an action against its insured even though it has independent knowledge of facts not in the pleadings that establish that the claim is *not* covered. ■ In this case, each of the insurance policies at issue required the insurer to defend WSBA in any suit alleging an injury under the respective policy even if the suit is " '. . . groundless, false or fraudulent.' Under such a clause it is the duty of the insurer to defend the insured when sued in any action where the facts alleged in the complaint support a recovery for an 'occurrence' covered by the policy, regardless of the fact that the insurer has knowledge that the injury is not in fact covered. [Citations.]" (*Remmer* v. *Glens Falls Indem. Co.* (1956) 140 Cal.App.2d 84, 90 [295 P.2d 19, 57 A.L.R.2d 1379]; see *Fireman's Fund Ins. Co.* v. *Chasson, supra,* 207 Cal.App.2d at pp. 805-807.)

In the seminal 1966 case of *Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d 263, the Supreme Court established the principles that we must follow in reviewing appellants' refusal to undertake their insured's defense. As here, the insurer in *Gray* argued that it did not need to defend an action "in which the complaint reveals on its face that the claimed . . . injury does not fall within the indemnification coverage . . . ." (*Id.,* at p. 268, fn. omitted.) In rejecting the insurer's position, the Supreme Court held that the insurer's duty is not measured by the technical legal cause of action pleaded in the underlying third party complaint, but rather by the *potential* for liability under the policy's coverage as revealed by the *facts* alleged in the complaint or otherwise known to the insurer.[2] "[E]ven if we . . . define the

problem, the courts have imposed a duty to defend whenever the insurer ascertains facts which give rise to the possibility or 'potential' of liability to indemnify [citation]." (*Fresno Economy Import Used Cars, Inc.* v. *United States Fid. & Guar. Co., supra,* 76 Cal.App.3d at p. 278.)

[2]The Supreme Court's decision in *Gray* is based on the additional, alternative grounds that the insurer bore an obligation to defend because the language of the policy led the insured reasonably to expect such a defense, and that an exclusionary clause in the policy purporting to bar defense coverage of claims such as those alleged in the complaint was ambiguous and not sufficiently conspicuous, plain and clear. Appellants attempt to distinguish *Gray,* arguing that there is no exclusionary clause at issue in this case, that the prin-

duty to defend by measuring the allegations in the [third party complaint] against the carrier's liability to indemnify, . . . the carrier must defend a suit which *potentially* seeks damages within the coverage of the policy . . . . [¶] Defendant cannot construct a formal fortress of the third party's pleadings and retreat behind its walls. The pleadings are malleable, changeable and amendable. . . . [C]ourts do not examine only the pleaded word but the potential liability created by the suit. . . . [¶] To restrict the defense obligation of the insurer to the precise language of the pleading would not only ignore the thrust of the cases but would create an anomaly for the insured. Obviously, . . . the complainant in the third party action drafts his [or her] complaint in the broadest terms; he [or she] may very well stretch the action which lies in only nonintentional conduct to the dramatic complaint that alleges intentional misconduct. In light of the likely overstatement of the complaint and of the plasticity of modern pleading, we should hardly designate the third party as the arbiter of the policy's coverage. [¶] Since modern procedural rules focus on the facts of a case rather than the theory of recovery in the complaint, the duty to defend should be fixed by the facts which the insurer learns from the complaint, the insured, or other sources. An insurer, therefore, bears a duty to defend its insured whenever it ascertains facts which give rise to the potential of liability under the policy." (*Id.*, at pp. 275-277, fn. omitted.)

■ Looking to the facts alleged in the Salveson complaint rather than the formal theory of liability or cause of action pleaded, and bearing in mind that where there is doubt as to whether the duty to defend exists, the doubt must be resolved in favor of the insured (*Eichler Homes, Inc.* v. *Underwriters at Lloyd's, London, supra,* 238 Cal.App.2d at p. 538), we conclude that those facts "give rise to the potential of liability" under appellants' policies, and appellants therefore bore the duty to defend WSBA.

The amended Salveson complaint was filed on March 3, 1978. Although it stated two causes of action, the second, for "intentional interference" with contractual and business relationships, was dismissed for lack of federal subject matter jurisdiction before WSBA tendered the defense of the lawsuit to appellants in July 1978. The remaining cause of action was entitled "antitrust." Appellants focus on this fact, and on the federal judge's

---

ciple of adhesion contracts is not applicable because of the greater bargaining equality of the parties here, and that WSBA had no "reasonable expectation" of coverage for the defense of the Salveson lawsuit under the policies at issue. We need not address these contentions, however, because we find that *Gray* is controlling here on the basis of its alternative ground that the insurer's duty to defend arises whenever the insurer ascertains facts which give rise to the *potential* of liability under the policy. (*Mullen* v. *Glens Falls Ins. Co., supra,* 73 Cal.App.3d at p. 172.)

ultimate ruling that the entire Salveson lawsuit was barred by the federal antitrust statute of limitations, in arguing that they had no duty to defend WSBA from an antitrust action which was not within the coverage of their policies. However, the first cause of action of the amended Salveson complaint also contained specific factual allegations in subparagraphs (i), (m), (o) and (q) of paragraph 21 which cannot so easily be discounted.[3]

Subparagraphs 21 (i) and (o) charged that WSBA misappropriated, stole and misused property interests and trade secrets and made misrepresentations to the Salveson plaintiffs "in an effort to further eliminate the competition of plaintiffs." These charges are arguably within Seaboard's coverage for piracy, unfair competition and idea misappropriation, particularly since these terms are undefined in Seaboard's policy, and must therefore be construed against the insurance carrier. (*Insurance Co. of North America* v. *Sam Harris Constr. Co.* (1978) 22 Cal.3d 409, 412-413 [149 Cal.Rptr. 292, 583 P.2d 1335]; 61 Cal.Jur.3d (rev. 1980) Unfair Competition, § 7, pp. 26-28.) Similarly, Seaboard's unfair competition provision and the provisions in the INA and Pacific insurance policies for libel, slander, or other defamatory or disparaging material potentially covered allegations in subparagraph 21 (m) that WSBA misrepresented "the business, property and rights possessed by [the Salveson] plaintiffs to persons with whom plaintiffs did business in an effort to disrupt and prevent" the business relationships between those persons and the plaintiffs. (Civ. Code, § 1770; *Gudger* v. *Manton* (1943) 21 Cal.2d 537, 541 [134 P.2d 217], disapproved on other grounds in *Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 381 [295 P.2d 405]; *Phillips* v. *Glazer* (1949) 94 Cal.App.2d 673, 677 [211 P.2d 37]; *Davis* v. *Wood* (1943) 61 Cal.App.2d 788 [143 P.2d 740]; 6 Cal.Jur.3d (rev. 1973) Assault and Other Wilful Torts, § 158, pp. 367-370.) Finally, the complaint's allegation in subparagraph 21 (q) that WSBA filed "false, frivolous and sham counterclaims" in the Salveson action raised at least the possibil-

---

[3]The relevant factual allegations of the Salveson amended complaint are as follows: "[D]efendants have done the following acts among others: . . .
. "(i) Knowingly misappropriated, stole and misused property interests and trade secrets of plaintiffs respecting their general purpose commercial transaction card systems. . . .
"(m) Intentionally issued and caused the issuance of statements misrepresenting the business, property and rights possessed by plaintiffs to persons with whom plaintiffs did business in an effort to disrupt and prevent the relationships and reasonably anticipated relationships between plaintiffs and said persons. . . .
"(o) . . . [M]ade intentional misrepresentations of fact to plaintiffs in an effort to further eliminate the competition of plaintiffs and for the express purpose of fraudulently delaying and obstructing plaintiffs' access to legal remedy. . . .
"(q) Agreed to file and caused the filing of false, frivolous and sham counterclaims in this action for the purpose of punishing plaintiffs and further securing and maintaining the monopoly position now enjoyed by defendants in the general purpose commercial transaction card business. . . ."

ity of liability under the malicious prosecution coverage contained in the insurance policies of INA and Pacific.[4] The trial court did not err in finding that these factual allegations gave rise to the *potential* of WSBA's liability under appellants' respective policies, and that appellants therefore bore the obligation to defend their insured, no matter how unmeritorious these claims may have been.

### III

Appellants contend that the federal court's dismissal of the Salveson complaint's second cause of action for intentional interference with contractual and business relationships on grounds of lack of federal subject matter jurisdiction, and subsequent dismissal of the remainder of the action on grounds of the antitrust statute of limitations, have collaterally estopped or otherwise barred CNA from asserting that the Salveson lawsuit sounded in anything but antitrust, contained potential common law tort claims covered by appellants' policies, or could be amended to allege any such causes of action. The contention is without merit.

The federal court's dismissal of the Salveson lawsuit's second cause of action in May 1978, prior to the tender of the defense to appellants, had no effect on appellants' duty to defend for several reasons. First, the alleged facts which triggered appellants' obligation to defend were contained within the first cause of action itself. It makes no difference that for strategic adversarial reasons this cause of action was labelled "antitrust"; as established by *Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d at pages 275-277, it is not the form or title of a cause of action that determines the carrier's duty to defend, but the potential liability suggested by the facts alleged or otherwise available to the insurer. Since this potential liability was apparent from the allegations of the first cause of action in the complaint presented to appellants, it was immaterial that the second cause of action had already been dismissed.

---

[4]INA argues that this allegation in the Salveson complaint regarding "false, frivolous and sham counterclaims" could not possibly be covered by the malicious prosecution provision in its policy, because any cause of action for malicious prosecution requires a prior termination of the earlier proceeding in favor of the party alleging malicious prosecution. However, when presented with a tender of a defense, it is not the insurer's place to analyze and evaluate the underlying claim of liability in order to reject the defense of any claim that is not meritorious. To the contrary, INA's own policy provides that it shall have the "duty to defend *any* suit against the Insured seeking damages on account of such . . . injury [including injury arising out of a malicious prosecution] *even if any of the allegations of the suit are groundless,* false or fraudulent . . . ." (Italics added.) The fact that INA may have known of a good defense, even an ironclad one, to the malicious prosecution claim did not relieve it of its obligation to defend its insured.

Second, none of the appellants conducted any investigation into the allegations of the Salveson lawsuit after the tender of defense. ■ "[B]efore an insurer may rightfully reject a tender of defense, it must investigate and evaluate the facts expressed or implied in the third party complaint as well as those which it learns from its insured and any other sources [citation]." (*Fresno Economy Import Used Cars, Inc.* v. *United States Fid. & Guar. Co., supra,* 76 Cal.App.3d at pp. 278-279; see also *Mullen* v. *Glens Falls Ins. Co., supra,* 73 Cal.App.3d at pp. 173-174.) Having utterly failed to investigate their potential liability despite the facts alleged on the Salveson complaint giving rise to that potential, appellants were barred from denying their insured the tendered defense.[5]

Third, contrary to appellants' speculative assertion, at the time of tender appellants had no grounds for concluding that the Salveson lawsuit was "incapable of amendment" to set forth explicit causes of action for malicious prosecution, libel, slander, defamation, disparagement, trade "piracy," unfair competition, or idea misappropriation. Appellants' argument that the federal judge would not have permitted any amendments is primarily based on hindsight, in light of the ultimate dismissal of the Salveson lawsuit under the antitrust statute of limitations. ■ The duty to defend cannot be adjudged on the basis of hindsight. It must be determined from the facts and inferences known to an insurer from the pleadings, available information and its own investigations at the time of the tender of defense. (*Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d at pp. 271-272, 275-277; *Fresno Economy Import Used Cars, Inc.* v. *United States Fid. & Guar. Co., supra,* 76 Cal.App.3d at pp. 278-279; *Mullen* v. *Glens Falls Ins. Co., supra,* 73 Cal.App.3d at pp. 173-174.)[6]

---

[5]Pacific argues, at some length, that WSBA violated its duty of good faith and fair dealing by failing to inform appellants of the dismissal of the pendent second cause of action for "intentional interference," and that CNA is therefore estopped, as subrogee, from arguing that the carriers should have investigated the Salveson lawsuit to ascertain if it was covered by their policies. The contention is meritless. As seen, any such failure on the part of WSBA could have had no prejudicial effect on appellants because the allegations giving rise to the potential liability under appellants' policies were all contained in the undismissed first cause of action tendered to them. The dismissal of the "intentional interference" cause of action simply had no effect on the *potential* liability arising from the rest of the Salveson complaint, and was therefore ultimately immaterial to the question of appellants' defense obligation.

[6]The case of *California Union Ins. Co.* v. *Club Aquarius, Inc.* (1980) 113 Cal.App.3d 243, 247 [169 Cal.Rptr. 685], on which Pacific relies heavily, is not applicable. That was an action by an insurer for declaratory relief on the issue of its obligation to defend, filed *after* a full trial on the underlying third party claim and the issuance of findings of fact making if clear that the lawsuit did not involve the limited risks set forth in the insurance policy. Here, appellants never took the step of undertaking the defense with a reservation of rights and then filing a declaratory relief action to determine if they were obliged to defend. The Salveson lawsuit never even reached the trial stage. The federal court's dismissal of the second cause of action did not constitute any sort of definitive finding that

At the time of tender, despite the federal court's dismissal of the pendent second cause of action, the possibility that the complaint could still be amended had not been precluded. Federal antitrust complaints are frequently amended to include causes of action for defamation, malicious prosecution, trade disparagement, unfair competition or idea misappropriation. (*Mayview Corp.* v. *Rodstein* (9th Cir. 1980) 620 F.2d 1347, 1349-1350 [62 A.L.R.Fed. 713]; *Ernest W. Hahn, Inc.* v. *Codding* (9th Cir. 1980) 615 F.2d 830, 834; *Breier* v. *Northern California Bowling Proprietors' Ass.'n.* (9th Cir. 1963) 316 F.2d 787, 789-791; *Star Lines, Ltd.* v. *Puerto Rico Maritime Ship. A.* (S.D.N.Y. 1978) 442 F.Supp. 1201, 1203-1204; *Landon* v. *Twentieth Century-Fox Film Corporation* (S.D.N.Y. 1974) 384 F.Supp. 450, 452; *Peerless Dental Supply Co.* v. *Weber Dental Mfg. Co.* (E.D.Pa. 1969) 299 F.Supp. 331, 332-336.) As stated by one federal court: "Where antitrust litigation is involved, allowance of amendments to complaints is perhaps especially proper for at least two reasons. First, antitrust litigation often involves complex legal issues and voluminous facts, most of which are usually in the possession of the defendant. As a result, it is not unusual that a plaintiff in such case should find it necessary to adjust his [or her] position and contentions as the case and its discovery proceed. Second, . . . Congress has determined that private litigation serves a useful and valuable role in the antitrust field, and the courts if at all possible should not impair this role of private litigation by placing unnecessarily strict pleading requirements on the parties involved. [Citation.]" (*Penn Galvanizing Company* v. *Lukens Steel Company* (E.D.Pa. 1974) 65 F.R.D. 80, 81.) In light of this federal policy of liberal amendment of antitrust lawsuits, appellants could not assume at the time WSBA tendered defense of the Salveson lawsuit that the federal court would not permit any amendment to the complaint.

The instant case is remarkably similar to the recent New York case of *Ruder & Finn* v. *Seaboard Sur.* (1981) 52 N.Y.2d 663 [439 N.Y.S.2d 858, 422 N.Ed.2d 518]. As in the instant case, the underlying federal lawsuit against the insured in *Ruder & Finn* purported to state a cause of action in antitrust and based federal jurisdiction on the Sherman and Clayton antitrust

WSBA would not be found liable for any acts actually covered by appellants' insurance policies. Moreover, even though the insurer received a declaratory judgment in its favor in *California Union Ins. Co. v. Club Aquarius, Inc.,* it was not retroactively relieved of its defense obligations; and it continued to have a defense duty until the declaratory judgment itself was final on appeal. (*Fireman's Fund Ins. Co.* v. *Chasson, supra,* 207 Cal.App.2d at p. 807 ["[T]he insurer had the duty to defend the personal injury actions and . . . the determination in the declaratory relief action of no liability under the policy did not have the effect of retroactively relieving the insurer of such duty to defend. However, once the judgment in the declaratory relief action becomes final (in this case upon the determination of this appeal), the insurer's duty to defend such actions shall cease since the duty to defend does not continue beyond the final determination that the claim is not within the coverage of the policy. [Citations.]"].)

acts. At the same time, the complaint included allegations that the insured "unfavorably represented and falsely desparaged [*sic*]" the plaintiff's products. The insurance carrier, Seaboard, rejected its insured's demand that it assume the defense of the lawsuit. Subsequently, the insured obtained a dismissal of the federal lawsuit on grounds of lack of subject matter jurisdiction. The insured then sued Seaboard to recover expenses incurred in defending the lawsuit. Seaboard argued that "two solitary, unsubstantiated words" that were part of a "patently groundless and 'shotgun allegation' in the middle of . . . a completely unrelated federal antitrust cause of action which was, itself, undisputedly *not* covered" by Seaboard's policy could not possibly evoke a duty to defend the insured. Although the trial court agreed, the New York Court of Appeals did not. It held that as a result of the allegation of "false disparagement," Seaboard had a duty to defend its insured under its policy's coverage for defamation and unfair competition.[7]

We find this reasoning persuasive. Indeed, the Salveson complaint made far more specific factual allegations potentially covered by the insurance policies at issue here than the "two words" in the underlying complaint in *Ruder & Finn.* ■■■ We therefore hold that the trial court did not err in finding that the Salveson complaint alleged facts which gave rise to potential liability covered by the policies of all three appellants, and that appellants therefore owed a duty to defend their insured, WSBA.

---

[7]"It is a well-established legal principle that the duty of an insurer to defend is broader than its duty to pay [citation]. The duty to defend arises whenever the allegations in the complaint fall within the risk covered by the policy. It therefore includes the defense of those actions in which alternative grounds are asserted, even if some are without the protection purchased. Further, a policy protects against poorly or incompletely pleaded cases as well as those artfully drafted. Thus the question is not whether the complaint can withstand a motion to dismiss for failure to state a cause of action. Nor is the insured's ultimate liability a consideration. If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be [citations]. . . . [¶] . . . While in [the federal] case the complaint's first cause of action was couched in terms of restraint of trade, it went on to allege that those whom it had joined as defendants were engaged in 'false disparagement'. . . . These facts, though found deficient to sustain the Federal antitrust claim, painted a picture which, had it been established, conceivably could have subjected defendant's insured and its codefendants to liability for commercial disparagement. Albeit the policy speaks in terms of 'defamation' rather than 'disparagement', we find the tort to which it refers within the scope of the insuring clause's protection. The conceptual similarities between these torts, the semantic sameness which laymen might ascribe to them (compare 'defamation' with 'disparagement' as defined in Webster's Third New International Dictionary) and, again, the rule of construction resolving ambiguities against the insurer all support this position. [¶] . . . [T]he absence of an element of a properly pleaded cause of action is of no moment in determining Seaboard's duty to defend. For that matter, neither did the fact that there was no colorable basis for Federal jurisdiction relieve Seaboard of its obligation. Rather, the latter merely provided the insurer with what in fact turned out to be a sure-fire defense in the Federal District Court." (*Ruder & Finn v. Seaboard Sur., supra,* 52 N.Y.2d at pp. 669-670, 672 [439 N.Y.S.2d at pp. 861-863].)

IV

Appellants argue that certain limitations and exclusions in their respective policies entitle them to refuse to defend WSBA in the Salveson action. We disagree.

First, INA points to an exclusion in its policy stating that it does not apply to personal injury arising out of a defamatory or disparaging publication or utterance, "if the first injurious publication or utterance of the same or similar material by or on behalf of the Named Insured [WSBA] was made prior to the effective date of this insurance . . . ." INA contends that because the Salveson lawsuit alleges that WSBA's illegal and tortious activities began "at a time unknown to plaintiffs but at least as early as 1966," and because the effective date of INA's coverage was in November 1969, any claim set forth in the complaint potentially within its libel, slander, or "other defamatory or disparaging material" provisions is excluded.

However, the Salveson complaint merely alleges that WSBA's entire course of conduct commenced "as early as 1966." It then proceeds to list a series of alleged wrongful acts committed by WSBA in 18 paragraphs, without indicating exactly when any of these specific acts occurred. The trial court below correctly concluded that "it was unclear whether the Salveson action would prove that WSBA made disparaging misrepresentations prior to the 1969 effective date of the INA coverage. ■ The spirit of *Gray* [v. *Zurich Insurance Co.*, *supra*, 65 Cal.2d 263] would not be served if an insurer could decline a defense where the application of an exclusion was only a possibility."

Seaboard argues that it was entitled to refuse WSBA's tender of defense because its policy was limited to coverage of enumerated wrongful acts "committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the Insured's advertising activities." The term "advertising" is not defined in Seaboard's policy, and therefore must be construed strictly against the carrier. (*Insurance Co. of North America* v. *Sam Harris Constr. Co.*, *supra*, 22 Cal.3d at pp. 412-413.) Even if we accept Seaboard's definition of "advertising" as " 'the action of calling something . . . to the attention of the public especially by means of printed or broadcast paid announcements . . .,' " it is clear that the factual allegations in the Salveson complaint referred at least potentially to misrepresentations, defamations and disparagements made to the public. Part of WSBA's function was to serve as the advertising arm of its member banks, and the entire question of the use or misuse of the Mastercard "service mark" was central to the Salveson lawsuit. Once again, the duty to

defend is broader than the duty to indemnify, and Seaboard was obligated to defend WSBA because the allegations of the Salveson lawsuit created at least the potential of liability covered by Seaboard's policy, even though that policy was limited to advertising. (*Miller* v. *Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 752-753 [161 Cal.Rptr. 322].)

■ Seaboard also urges that the claims made in the Salveson complaint were specifically barred by an exclusion in its policy excluding coverage for "any claim or suit based upon or arising out of alleged false, misleading, deceptive, fraudulent or misrepresenting advertising or to any claim or suit for unfair competition based thereon . . . ." However, this exclusion is ambiguous on its face. It would appear to exclude coverage for virtually any claim made under the Seaboard policy, which purports to provide indemnification for damages resulting from libel, slander, defamation, piracy, unfair competition or idea misappropriation committed or alleged to have been committed in an advertising context. Any ambiguity in an exclusionary clause will be strictly interpreted against the insurer, and reasonable doubts as to uncertain language must be resolved in favor of the insured. (*Crane* v. *State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089]; *Gray* v. *Zurich Insurance Co.*, *supra*, 65 Cal.2d at pp. 269-274; *Miller* v. *Elite Ins. Co.*, *supra*, 100 Cal.App.3d at p. 751.) A literal interpretation of the exclusionary clause at issue would unreasonably restrict the coverage of Seaboard's policy. We therefore find this exclusionary provision inapplicable to the facts of this case.[8]

## V

All three appellants argue that WSBA concealed material facts concerning the history of Salveson's dispute with the banks who were members of

---

[8]Citing Insurance Code section 533 and Civil Code section 1668, which establish a public policy against insurance coverage or indemnification for liability for wilful tort, Seaboard argues that "[i]f the Salveson complaint, as tendered for defense, could by any stretch of the imagination come within the terms of the Seaboard advertiser's liability policy, Seaboard would violate the public policy of this State if it undertook to defend or to indemnify the accused WSBA." This precise argument was made by the insurer in *Gray* v. *Zurich Insurance Co.*, *supra*, 65 Cal.2d 263, and was there rejected. "In the first place, the statutes forbid only contracts which indemnify for '*loss*' or '*responsibility*' resulting from wilful wrongdoing. . . . [T]he statutes 'establish a public policy to prevent insurance coverage from encouragement of wilful tort.' . . . [I]f an insurer's obligation to pay a judgment based on wilful conduct results from an estoppel *after* the conduct, the obligation could not have previously encouraged the conduct. Similarly, the present contract does not offend the statute; a contract to defend an assured upon mere accusation of a wilful tort does not encourage such wilful conduct." (*Id.*, at pp. 277-278.) In any event, Seaboard's obligation to defend WSBA does not arise from the antitrust charges in the complaint, but rather from the charges relating to defamation, unfair competition, and idea misappropriation, as to which Seaboard's policy expressly agreed to provide a defense.

WSBA, and that CNA, as WSBA's subrogee, is therefore estopped under the Insurance Code from claiming any coverage under appellants' policies, including any duty to defend.[9]

We have some doubt as to whether CNA, as the sole insurance company which recognized its obligation to defend WSBA and which consequently incurred all the cost of defense, can be saddled with all the defenses appellants may have against WSBA itself. (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 876 [151 Cal.Rptr. 285, 587 P.2d 1098]; *Murphy* v. *Allstate Ins. Co.* (1976) 17 Cal.3d 937, 942-944 [132 Cal.Rptr. 424, 553 P.2d 584]; *Barrera* v. *State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659, 670-673 [79 Cal.Rptr. 106, 456 P.2d 674] [in an action by injured third party claimant, misrepresentations by the insured held not to constitute a defense for an insurer who failed to investigate insurability promptly].) Setting this concern to one side, however, we conclude that substantial evidence supports the trial court's finding that there was no material concealment by WSBA sufficient to void appellants' duties to defend. Although WSBA did not inform its insurers of its past disputes with Salveson until after the lawsuit was filed, the evidence showed that those disputes had actually been between Salveson and individual banks, for the most part had occurred prior to the creation of WSBA, and had been completely resolved by a settlement agreement in March 1967, shortly after WSBA came into existence. Salveson made no claims or threats against WSBA during the entire 10-year period between his settlement agreement with WSBA and the filing of the lawsuit in March 1977.

■ The issue of whether WSBA committed a "material concealment" under the Insurance Code is a question of fact to be decided by the trial court on the basis of the evidence. (*Horn* v. *Guaranty Chevrolet Motors* (1969) 270 Cal.App.2d 477, 482-483 [75 Cal.Rptr. 871]; *Joyce* v. *United Ins. Co.* (1962) 202 Cal.App.2d 654, 662 [21 Cal.Rptr. 361, 17 A.L.R.3d 517]; *Olson* v. *Standard Marine Ins. Co.* (1952) 109 Cal.App.2d 130, 137-138 [240 P.2d 379].) ■ On appeal, the judgment must be upheld if it

---

[9]The following provisions of the Insurance Code are relevant: "Neglect to communicate that which a party knows, and ought to communicate, is concealment." (Ins. Code, § 330.)

"Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance." (Ins. Code, § 331.)

"Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his [or her] knowledge which are or which he [or she] believes to be material to the contract and as to which he [or she] makes no warranty, and which the other has not the means of ascertaining." (Ins. Code, § 332.)

"Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his [or her] estimate of the disadvantages of the proposed contract, or in making his [or her] inquiries." (Ins. Code, § 334.)

was supported by any substantial evidence, even if it is against the weight of other contradictory evidence. (*Campbell* v. *Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121]; *Chodos* v. *Insurance Co. of North America* (1981) 126 Cal.App.3d 86, 97 [178 Cal.Rptr. 831].) This court must examine the record in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving all conflicts in support of the judgment. (*Board of Education* v. *Jack M.* (1977) 19 Cal.3d 691, 697 [139 Cal.Rptr. 700, 566 P.2d 602]; *Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384].) Where evidence is undisputed, but different inferences may be drawn therefrom, we are not at liberty to make our own inferences and decide the case accordingly; the conclusion of the trial judge must be accepted, since it is for the trier of fact to resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn. (*McKinney* v. *Kull* (1981) 118 Cal.App.3d 951, 955 [173 Cal.Rptr. 696]; *Curtis* v. *Mendenhall* (1962) 208 Cal.App.2d 834, 839 [25 Cal.Rptr. 627].)

Here, the trial court's finding that respondents failed to establish material concealment by WSBA is supported by substantial evidence that was of "'ponderable legal significance,'" "'reasonable in nature, credible, and of solid value . . . .'" (*United Professional Planning, Inc.* v. *Superior Court* (1970) 9 Cal.App.3d 377, 392-393 [88 Cal.Rptr. 551]; *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].) There was no error.

## VI

. We now turn to the arguments raised by Pacific alone. It contends that CNA "failed to establish" that Pacific had issued a personal injury liability policy to WSBA, and that the trial court erred in so finding. Once again, despite Pacific's strained attempts to characterize it otherwise, this argument is actually a challenge to the sufficiency of the evidence. Indeed, Pacific concedes that the evidence on this issue was "conflicting"; however, it insists that the real issue is the burden of proof.

That "issue" is completely immaterial, since the trial court's finding that Pacific did issue such a policy is supported by substantial evidence. For the most part, this evidence consisted of the testimony of Mr. David Cuddeback, the account executive with Marsh & McLennan who obtained the insurance for WSBA in 1966. Cuddeback testified on the basis of his personal knowledge that the INA form of personal injury endorsement was the standard form used in the insurance industry, and that Pacific used that form. Pacific's own witness, Francis Culhane, agreed that there was a standard form of personal injury endorsement used in the industry and that

Pacific used that standard form. This evidence alone was substantial and sufficient to support the trial court's findings on this issue. (*Campbell* v. *Southern Pacific Co., supra,* 22 Cal.3d at p. 60; *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].)

### VII

Next, Pacific contends that it was absolved from its responsibility to defend because WSBA failed to give it prompt notice of Salveson's claims after issuance of the policy, and because CNA failed to tender a formal demand for a defense prior to incurring litigation expense in defending the Salveson lawsuit. These contentions are without merit.

The evidence in the record supports the trial court's finding that Pacific had adequate notice of potential liability to prevent any substantial prejudice to its interests, and that CNA should therefore not be estopped from seeking reimbursement. At WSBA's request, Marsh & McLennan notified Pacific in July 1978 of the Salveson lawsuit and WSBA's tender of the defense thereof. Pacific promptly denied the tender on the grounds that its policy provided no coverage. It was clearly not prejudiced by any subsequent failure on CNA's part to make a formal demand to share in the defense.

Pacific also asserts that it was relieved from its obligation to defend by WSBA's failure to inform it of certain threats made by Salveson after issuance of Pacific's policy, just before the settlement agreement of March 1967. ▮▮▮ " ' 'The law is established that where an insurance company denies liability under a policy which it has issued, it waives any claim that the notice provisions of the policy have not been complied with.' [Citation.]" (*Lagomarsino* v. *San Jose etc. Title Ins. Co.* (1960) 178 Cal.App.2d 455, 460 [3 Cal.Rptr. 80]; cf. *Clemmer* v. *Hartford Insurance Co., supra,* 22 Cal.3d at pp. 881-883.) Having denied all liability under its policy, Pacific thus waived any claim it might have that WSBA forfeited its right to a defense by failing to notify Pacific of Salveson's claims..

### VIII

Pacific's final contention is that the trial court erred in awarding CNA its defense costs incurred after trial below in July 1981. By that time, appellants had acquired actual knowledge of the dismissal of the second cause of action of the Salveson complaint (the "intentional interference" cause of action), and of the granting of the motion for summary judgment as to the remainder of the Salveson lawsuit in February 1981 on statute of limitations grounds. Pacific argues that as a result of these actions by the court, any

duty to defend WSBA ended and CNA could have no rights to reimbursement for defense costs thereafter.

Pacific raises this contention for the first time on appeal.[10] As a general rule, issues not properly raised at trial will not be considered on appeal. (9 Witkin, Cal. Procedure, *supra,* Appeal, § 311, pp. 321-322.) An appellate court may in its discretion consider an issue not properly raised in the trial court if the issue presents a pure question of law on undisputed evidence regarding either a noncurable defect of substance, such as lack of jurisdiction or complete failure to state a cause of action, or a matter affecting the public interest or the due administration of justice. (*Wilson* v. *Lewis* (1980) 106 Cal.App.3d 802, 805 [165 Cal.Rptr. 396]; *Redevelopment Agency* v. *City of Berkeley* (1978) 80 Cal.App.3d 158, 167 [143 Cal.Rptr. 633]; 9 Witkin, Cal. Procedure, *supra,* Appeal, § 315, pp. 326-327.) The issue presented, although apparently based on uncontroverted facts, is not of the above description. We therefore decline to consider it. (*Zito* v. *Firemen's Ins. Co.* (1973) 36 Cal.App.3d 277, 283 [111 Cal.Rptr. 392].)[11]

## IX

We now turn to CNA's cross-appeal. CNA raises two issues: first, whether the trial court's apportionment of the costs of WSBA's defense among

---

[10]In its reply brief, Pacific asserts in a footnote that it did raise this issue in a letter to the trial judge dated November 22, 1982. A copy of the letter is attached to the reply brief. Pacific states that it was "inexplicably" not included in the clerk's transcript. Pacific owes this court more than this gratuitously empty excuse in explanation for its total failure to include in the record the only scrap of evidence indicating its objection to the trial court's award of post-trial defense costs. Such references to matters outside the record on appeal are not reviewable or cognizable by this court and are not in compliance with the Rules of Court. (Cal. Rules of Court, rule 15(a); 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 250, 475, pp. 256-257, 467-468.) In any event, the letter only professes to offer "observations" for the court's "thoughtful consideration." On its face, it makes no actual objection to the award of post-trial defense costs attacked for the first time on appeal. Such a letter hardly constitutes an appropriate or adequate method in which to raise an objection for the trial court's consideration.

[11]We note that despite the federal trial court's grant of the motion for summary judgment with regard to the Salveson lawsuit in February 1981, the decision was appealed to the Ninth Circuit Court of Appeals and was still on appeal at the time of the trial in the instant case. The judgment at issue was filed and entered on December 30, 1982. The Ninth Circuit's decision affirming the Salveson summary judgment was not filed until March 1983. Thus, for purposes of Pacific's obligation to defend WSBA, the judgment in the Salveson lawsuit was not final at the time of the trial court's award of defense expenses in this case. Under California law, the insurer's duty to defend does not cease until the final determination of the underlying action on appeal. (*Fireman's Fund Ins. Co.* v. *Chasson, supra,* 207 Cal.App.2d at p. 807.)

the four insurers was equitable; and second, whether CNA was entitled to receive its own attorneys' fees in bringing the instant action.

A

All the insurers before this court were jointly responsible for defending WSBA in the Salveson lawsuit. (*Continental Cas. Co.* v. *Zurich Ins. Co.* (1961) 57 Cal.2d 27, 37 [17 Cal.Rptr. 12, 366 P.2d 455].) ▬ The costs of defense must be apportioned on the basis of equitable considerations not found in the insurers' own contracts, since the insurance companies who must share the burden do not have any agreements among themselves. The courts have expressly declined to formulate any definitive rules for allocating defense costs among carriers, because of the "varying equitable considerations which may arise, and which affect the insured and the . . . carriers, and which depend upon the particular policies of insurance, the nature of the claim made, and the relation of the insured to the insurers. [Citation.]" (*Signal Companies, Inc.* v. *Harbor Ins. Co.* (1980) 27 Cal.3d 359, 369 [165 Cal.Rptr. 799, 612 P.2d 889, 19 A.L.R.4th 75].)

Here, the trial court apportioned the costs of defense among the four insurers on the basis of the relative limits of coverage set by their respective policies. Thus, because CNA, INA and Pacific each had policy limits of $300,000, while Seaboard's policy limits were only $100,000, the court determined that CNA, INA and Pacific would each be responsible for 30 percent of the cost of defense and Seaboard would be responsible for 10 percent.

CNA argues that this method of allocation employed by the trial court was inadequate. It contends that simple allocation of the costs of defense by relative policy limits does not equitably take into account the fact that the policies of the four insurers were both concurrent and consecutive and covered entirely different periods of time, while the risk of liability itself, measured by the terms of the underlying complaint, was not limited to specific times and dates but instead was continuous over a broad time span from 1966 through 1978.

CNA urges that in this case, the most equitable method of allocating defense costs is to multiply the number of years of coverage of each insurance policy, or any fraction thereof, by the per year aggregate liability limits stated in that policy, and then to compare the resulting product for each insurer against the total coverage available to WSBA in order to determine that insurer's pro rata percentage share of the defense costs. As set forth in CNA's brief on its cross-appeal, the approximate pro rata percentage shares

of defense costs calculated in this way are: Pacific, 20.7 percent; INA, 42 percent; CNA, 12.6 percent, and Seaboard, 24.7 percent.

The trial court below concluded that the method of allocating defense costs among the contributing insurers suggested by CNA was not supported by California case law. We agree by virtue of the numerous appellate decisions supporting the trial court's procedure of prorating defense costs, and the complete absence of any California cases adopting CNA's proposed approach. It is an accepted principle of California law that "[w]here two insurers cover the same risk, defense costs must also be shared between them pro rata in proportion to the respective coverage afforded by them to the insured. [Citation.]" (*Continental Ins. Co.* v. *Morgan, Olmstead, Kennedy & Gardner, Inc.* (1978) 83 Cal.App.3d 593, 608 [148 Cal.Rptr. 57]; accord *Signal Companies, Inc.* v. *Harbor Ins. Co., supra,* 27 Cal.3d 359; *Travelers Indem. Co.* v. *Reliance Ins. Co.* (1974) 12 Cal.3d 133 [115 Cal.Rptr. 232, 524 P.2d 360]; *Continental Cas. Co.* v. *Zurich Ins. Co., supra,* 57 Cal.2d 27; *Hartford Acc. & Indem. Co.* v. *Pacific Indem. Co.* (1967) 249 Cal.App.2d 432 [57 Cal.Rptr. 492]; *Government Employees Ins. Co.* v. *St. Paul Fire etc. Ins. Co.* (1966) 243 Cal.App.2d 186 [52 Cal.Rptr. 317]; *Oil Base, Inc.* v. *Transport Indem. Co.* (1956) 143 Cal.App.2d 453 [299 P.2d 952].) The method of allocation employed by the trial court was, on the whole, fair and reasonable. We decline to reverse the court for using a procedure adopted in every California case on point.

CNA argues, however, that these decisions do not stand for a particular method of allocation to be used in every case. It points out that recent decisions have repeatedly emphasized the contrary principle in these cases that there is *no* definitive rule universally applicable in all situations; instead, courts must apply equitable considerations in allocating defense costs on a case-by-case basis. (*Signal Companies, Inc.* v. *Harbor Ins. Co., supra,* 27 Cal.3d at p. 369.) We agree that in given cases, the true scope of an insured's "coverage" might not be confined to the liability limits of a given policy; it may also include the period of time covered by the policy and the interrelation between the terms of the policy and the wrongs alleged against the insured by a claimant. In this case, however, the trial court did not abuse its discretion in assessing damages according to the formula followed by an overwhelming weight of authority.

B

We are not persuaded by CNA's final argument that it was entitled to receive *its* attorneys' fees incurred in bringing the instant action. CNA argues that since it was equitably subrogated to the rights of WSBA, it

should recover its attorneys' fees just as WSBA assertedly would have had the latter sued INA, Seaboard and Pacific for breach of the covenant of good faith and fair dealing.

On its face, this contention is based entirely on hypotheticals with no foundation in fact. WSBA did not assert any claim against INA, Seaboard and Pacific arising out of the underlying Salveson lawsuit. WSBA is not even a party to this action. The defense costs at issue here were those incurred on WSBA's behalf in the Salveson lawsuit; WSBA has suffered no loss in *this* case. There was no finding that any of the insurers breached the covenant of good faith and fair dealing with WSBA or that their conduct in this matter was tortious; nor was this an issue here. CNA itself has no contractual relationship with the other insurers and thus no standing to assert a breach of the covenant of good faith and fair dealing in its own right. Thus, CNA has no standing to recover its attorneys' fees in this action.[12]

The judgment is affirmed. Respondent and cross-appellant CNA is awarded its costs on appeal.

Scott, Acting, P. J., and Merrill, J., concurred.

Petitions for a rehearing were denied February 13, 1986, and the petitions of defendants and appellants for review by the Supreme Court were denied April 17, 1986.

---

[12]Prior to *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796], WSBA would not have been entitled to attorneys' fees from the insurers even if it had in fact sued them for breach of the covenant of good faith and fair dealing, and won. The established rule was that in the absence of an agreement between the parties, attorneys' fees were not recoverable in a bad faith action against an insurance company. (Code Civ. Proc., § 1021; *Moore* v. *American United Life Ins. Co.* (1984) 150 Cal.App.3d 610, 644-645 [197 Cal.Rptr. 878]; *Austero* v. *Washington National Ins. Co.* (1982) 132 Cal.App.3d 408, 411-417 [182 Cal.Rptr. 919].) However, in *Brandt* v. *Superior Court, supra,* 37 Cal.3d at page 815, the Supreme Court held that "[w]hen an insurer tortiously withholds benefits, . . . attorney's fees, reasonably incurred to compel payment of the policy benefits, [are] recoverable as an element of the damages resulting from such tortious conduct . . . ." (Fn. omitted.) The court determined that attorney's fees were not recoverable *qua* attorney's fees, but rather as an element of the damages proximately caused by the insurer's tortious breach of the covenant of good faith and fair dealing. (*Id.,* at pp. 815-818.) The case is not applicable here, where tortious conduct by the insurers or bad faith was never alleged, argued, proven, or determined. As the Supreme Court itself points out in *Brandt,* " '[A]n erroneous interpretation of an insurance contract by an insurer does not necessarily make the insurer liable in tort for violating the covenant of good faith and fair dealing; to be liable in tort, the insurer's conduct must also have been *unreasonable.* [Citations.] When no bad faith has been alleged and proved, [previously decided cases] preclude the award of attorney's fees incurred in obtaining benefits that the insurer erroneously, but in good faith, withheld from the insured. . . .' [Citation.]" (*Id.,* at p. 819, original italics.)