216 N.J. Super. 697 (1987)
524 A.2d 882
CITY OF CAPE MAY, A MUNICIPAL CORPORATION, ROBERT CABANA AND FRED COLDREN, IN THEIR CAPACITY AS OFFICIALS OF THE CITY OF CAPE MAY, AND "CITY OFFICIALS" ALLEGED AS DOES I THROUGH X, INCLUSIVE, PLAINTIFFS-APPELLANTS,
v.
THE ST. PAUL FIRE AND MARINE INSURANCE COMPANY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 14, 1987.
Decided April 9, 1987.
*698 Before Judges KING, DEIGHAN and HAVEY.
Lars S. Hyberg argued the cause for appellants (Valore, McAllister, Westmoreland, Gould, Vesper & Schwartz, attorneys).
Steven F. Nemeth argued the cause for respondent (Grossman & Kruttschnitt, attorneys; Richard A. Grossman, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
This case calls upon us to construe a "Libel, Slander, Defamation or Violation of Right of Privacy" insuring agreement in a comprehensive general liability policy issued to a municipality. This is a declaratory judgment action by the City of Cape May and its City Managers Fred Coldren and Robert Cabana, brought in 1984 to establish insurance coverage and a duty to defend, against St. Paul Fire and Marine Insurance Company (St. Paul) arising from a law suit captioned in pertinent part, Robert B. Spiegle v. City of Cape May, Robert Cabana and *699 Fred Coldren, "City Officials"[1], Docket No. L-74717-80, in the Superior Court, Law Division.
On February 1, 1978 St. Paul issued policy number 629 NA 7462 to the City of Cape May which included comprehensive general liability insurance coverage. The basic insuring agreement provided these coverages pertinent to this case
Group B.  the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising, broadcasting or telecasting activities conducted by or on behalf of the Named Insured; [Emphasis added].
The first count of the complaint filed by Spiegel was captioned: "Malicious Interference." The substance of the first count was that the officials of the City maliciously interfered with Spiegle's business interests by statements to the print media and others. The statements generally were allegations that Spiegle's activities were designed to drive up the value of beach front property so that later condemnation awards to owners would be higher. Paragraph 11, for instance, alludes to "the serious and injurious effects of such false statements upon, of and concerning the plaintiff, that the same will be repeated by persons who heard and read thereof, that gossip, reports and rumors will naturally ... result therefrom ... to ... the permanent injury to plaintiff's reputation."
The second count was captioned: "Slander and Libel." It incorporated by reference all of the allegations of Count One. It substantially alleged conventional common-law libel and slander, a defamation claim.
This is the factual background. On October 20, 1978 Robert D. Spiegle purchased a parcel of real estate on the beach in the *700 City of Cape May for the price of $55,650. The parcel is a strip of the City of Cape May's beach with about a 54-foot frontage which extends approximately 1000 feet towards and into the ocean. The property lies south of Beach Avenue and consists solely of sandy beach. The zoning ordinance allowed only recreational use of the beach parcel with all building prohibited.
The beach had been used for years for recreational purposes including sun-bathing and swimming. Although some commercial income resulted from rental of beach equipment, any form of commercial use of the beach which involved building permits, structures or sales of items was prohibited by Ordinance "S-1". The assessment on Spiegle's parcel at the time of purchase was $4,200, a sum comparable to the assessment of other similarly-situated beaches parcels. These assessments were based upon the limited permitted uses of the property. The City of Cape May's policy of maintaining its beaches for public and recreational use has continued, manifested by a policy condemning remaining privately-owned beach parcels for acquisition by the City at fair market value.
After Spiegle purchased the property, the Atlantic City Press, a local newspaper of general circulation, published articles quoting statements that the City Manager Robert Cabana had made questioning the sale. The articles reported that Cabana had stated he could not understand why anyone would spend so much money on land that could not be developed because of the existing restrictive zoning ordinances. The article reported that Cabana stated that the property transfer involved what appeared to be a fictitious sale, and that the sale price was generated in an attempt to drive up the price of the property in the event of a condemnation action. Spiegle claimed he was going to build on the beach, despite the protective ordinances. Spiegle filed his law suit alleging that he had been defamed and that he had been the victim of a malicious interference with his business as a result of these statements published in the Atlantic City Press.
*701 The City forwarded the suit papers to St. Paul for defense and potential indemnification. St. Paul initially defended the suit against the City, Cabana and Coldren under a reservation of rights letter. After summary judgment was entered on the libel and slander claims in the second count against City and its two officials, St. Paul withdrew from the case, denying coverage and refusing to defend the allegations of malicious interference with Spiegle's business asserted in the first count.
The denial of coverage by St. Paul was based upon the claim that there was no coverage in the first place for the first count's malicious interference claim. While admitting that the libel and slander claims were covered, St. Paul absolutely denied coverage for malicious interference. The remaining count, for which coverage was denied, was then successfully defended by the plaintiffs' personal counsel who obtained a summary judgment in May 1985, which was later affirmed on appeal in 1986.
Based on these agreed facts, the Law Division judge ruled that the St. Paul policy provided no coverage for the first count sounding in malicious interference with business or economic relationships. The Law Division judge summarized the procedural posture of the case in which his written opinion and judgment were rendered in this way.
Defendant St. Paul initially defended the plaintiff on the claim under a reservation of rights letter, but withdrew after summary judgment for the defendant was granted in favor of all "newspaper defendants".[1] The trial court granted summary judgment to those defendants, not only on the alleged libel; but also on the malicious interference count, concluding from an analysis of that count that it essentially alleged libel. After arriving at that decision, the trial court concluded that N.J.S.A. 2A:14-3, imposed a one year statute of limitation upon the cause of action and thus it was time-barred. The plaintiff appealed this decision, which was affirmed by the appellate division. Thereafter, on May 10, 1985, summary judgment as to all issues was granted as to all defendants, a part of which judgment is presently on appeal before the appellate division. In that judgment, the court found the alleged libelous action time-barred and the alleged malicious interference with prospective economic advantage count to be without merit. (The dismissal as to all remaining "non-newspaper"[2] defendants on the cause of action for slander is not appealed).

*702 Defendant St. Paul having been successful in establishing that the libelous statements are time-barred, asserts that the remaining malicious interference count is not covered by the policy. Therefore, defendant contends that it has no obligation either to defend or to pay any judgment that may follow, should the decision on appeal, referable to malicious interference with prospective economic advantage, ultimately be reversed. Plaintiff, to the contrary, contends that the interference count is covered by the policy, as it is based on the same act formerly characterized as slander and libel.
[1] Term used by both the trial court and the Appellate Division to describe those named defendants involved in the reporting, publication and distribution of newspapers.
[2] This court's designation.
In ruling in St. Paul's favor the Law Division judge reasoned:
When an insurer goes on the risk for libel, slander or defamation, it is reasonable to assume that it does so with full reliance on the short statutory limitation on that cause of action and reposes comfortable in the knowledge that the courts generally do not favor that class of litigation. No such limitation or distaste is attached to actions based on the evil intention of one party to interfere with the legitimate rights of another.
It is the holding of this court that a cause of action for defamation is palpably distinct from a cause of action for malicious interference with prospective economic advantage. This court finds that a plain reading of the policy requires the determination that the risks agreed to be insured against by both parties were slanderous, libelous and defamatory statements, but not statements defamatory in and of themselves (or not, as the case may be) which are specifically and maliciously designed and intended to interfere with another's prospective economic advantage.
The controlling principles have recently been recited in detail by our colleague Judge Baime in NPS Corp. v. Insurance Co. of North America, 213 N.J. Super. 547 (App.Div. 1986), a case involving coverage of a claim for sexual harassment under a liability policy.
We commence our analysis with the well-settled principle that an insurer's duty to defend an action against the insured is measured by the allegations set forth in the complainant's pleadings. The Ohio Cas. Ins. Co. v. Flanagin, 44 N.J. 504, 512 (1965); Danek v. Hommer, 28 N.J. Super. 68, 77 (App.Div. 1953), aff'd 15 N.J. 573 (1954); 8 Appleman, Insurance Law and Practice, § 4683, p. 8 (1953). The duty to defend arises when the complaint states a claim constituting a risk falling within the purview of the policy coverage. Danek v. Hommer, supra, 28 N.J. Super. at 77. "[I]f [the] pleadings state facts bringing the injury within the coverage of the policy, the insurer must defend, irrespective of the insured's ultimate liability to the [complainant]." 8 Appleman, Insurance Law and Practice, supra, § 4683, p. 8 "The nature of the damage claim, rather than the actual details of the accident or the ultimate liability of the insure[d], determines whether the insurer is obliged to defend." The Ohio *703 Cas. Ins. Co. v. Flanagin, supra, 44 N.J. at 512. See also Hackensack Water Co. v. General Accident, etc., Ltd., 84 N.J. Super. 479, 483 (App.Div. 1964); Van Der Veen v. Bankers Indemnity Ins. Co., 30 N.J. Super. 211, 217 (App.Div. 1954).
In construing the policy language, our aim is to determine the intent of the contracting parties. Our inquiry is aided by several well-recognized principles. Initially, we note that "[i]nsurance contracts are unipartite in character." Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, 35 N.J. 1, 7 (1961). Such contracts "are prepared by the company's experts, [people] learned in the law of insurance who serve its interest in exercising their [craft]." Ibid. The policy thus comes to the insured in predetermined fashion "in printed form upon the payment of his premium." Id. at 8. These "circumstances long ago fathered the principle that doubts as to the existence of coverage must be resolved in favor of the insured." Ibid. See also Butler v. Bonner & Barnewall, Inc., 56 N.J. 567, 576 (1970); Kook v. American Sur. Co. of N.Y., 88 N.J. Super. 43, 52 (App.Div. 1965). "Courts are bound to protect the insured to the full extent that any fair interpretation will allow." Mazzilli v. Acc. & Cas. Inc. of Winterthur, supra, 35 N.J. at 7. See also Kievit v. Loyal Protec. Life Ins., 34 N.J. 475, 482 (1961). The policy must be read so as to fulfill "the reasonable expectations of the average purchaser in the light of the contract language." Linden Motor Freight Co., Inc. v. Traveler's Ins. Co., 40 N.J. 511, 525 (1963).
We disagree with the Law Division judge's conclusion that the pertinent clause of the insuring agreement limited coverage to conventional common-law defamation actions, i.e., libel and slander, alone. The insuring agreement promised more. In it, St. Paul promised to defend and pay all claims "arising out of ... the publication or utterance of a libel or slander or other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy; ..." If the insurer intended to cover only libel, slander, and invasion of privacy, it should have stopped there; the words "other defamatory or disparaging material" must be given some content. We cannot deem them meaningless surplusage, even under the principle of ejusdem generis urged as controlling by St. Paul. E.g., Gullett v. St. Paul Fire & Marine Insurance Company, 446 F.2d 1100 (7th Cir.1971) (construction of multi-peril policy where damages were caused by earth movement). We must resolve ambiguities in insurance contracts "against the insurance companies." Sparks v. St. Paul Ins. Co., 100 N.J. 325, 336 (1985); DiOrio v. New Jersey Mfgs. Ins. Co., 79 N.J. 257, 269 (1979).
*704 The problem of uncertain coverage here probably arose for the most part because Spiegle's lawyer attempted in Count One of the damage suit to plead himself outside of a cause of action for libel and slander because of the one-year time-bar. N.J.S.A. 2A:14-3. Nevertheless, the substance of the claim in the first count, though rather inartfully cast, was based on the "utterance... of other defamatory or disparaging material" than what would constitute classic libel or slander, as alleged in Count Two. Prosser recognizes that one of the means by which the tort of malicious interference may allegedly be accomplished is by "defamation [or] injurious falsehood." Prosser and Keeton, Torts (5th ed. 1984) § 130 at 1009, n. 39 and n. 40. Moreover, he suggests that malicious interference is within a class of wrongs generally known as "communicative torts," id. at 1011, and our Supreme Court has recently observed that causes of action for defamation and malicious interference through product or other forms of business disparagment "sometimes overlap" and "tend to blur." Dairy Stores Inc. v. Sentinel Pub. Co., 104 N.J. 125, 133, 134 (1986); see Ruder & Finn, Inc. v. Seaboard Sur. Co., 52 N.Y.2d 663, 670, 439 N.Y.S.2d 858, 861, 422 N.E.2d 518, 521 (Ct.App. 1981) (defense of product disparagement claim covered under libel policy). In such a circumstance of uncertainty, created by ambiguity of the policy language and the vagaries of the claimant's pleadings, we think that the law gives the insured the benefit of the doubt. See CNA Casualty of California v. Seaboard Surety Co., 176 Cal. App.3d 598, 222 Cal. Rptr. 276, 281 (Ct.App. 1986) (defense of intentional interference claim owed where policy insured against libel, slander or other disparaging material).
Judge Posner in his recent work, Posner, Economic Analysis of Law, § 4.5 at 95 (3rd ed. 1986), cogently observed
Understanding the insurance function of contracts makes it easier to understand the interpretation of contracts with insurance companies. Take the principle that insurance contracts are to be construed against the insurer. This may seem paternalistic or sentimental, but there is an economic argument for it. One's insurance coverage will turn out to be less extensive than it appeared to be, if ambiguities in the insurance policy are resolved against the insured. *705 The insurance company is the superior bearer of this risk, too. Of course, if all interpretive doubts are resolved against the insurance company, its costs, and hence premium rates, will be higher. But all this means is that the insured is buying some additional insurance.
We agree and our case law is in concurrence with this view. St. Paul had a duty to defend the malicious interference through disparagement claim in Count One of Spiegle's law suit against the City and its officials.
Reversed for a determination of damages.
NOTES
[1] The entire caption read: "ROBERT D. SPIEGLE v. CITY OF CAPE MAY, a municipal corporation, ROBERT CABANA, FRED COLDREN, "CITY OFFICIALS" alleged as DOES I thru X INCLUSIVE, THE PRESS a/k/a ATLANTIC CITY PRESS, Division of ABARTA CORPORATION, a corporation, SOUTH JERSEY PUBLISHING COMPANY OF ABARTA, Incorporated, a corporation of Pennsylvania; CHARLES REYNOLDS, MICHAEL YOUNG and CARLA LINZ."