**OLYMPIC CLUB, Plaintiff–
Counterclaimant–
Appellant,**

v.

**THOSE INTERESTED UNDERWRIT-
ERS AT LLOYD'S LONDON, who sub-
scribed to Directors and Officers Lia-
bility Including Organization Reim-
bursement Insurance Policy No. NP
00400, Defendants–Appellees.**

No. 91–16180.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 21, 1992.

Decided April 7, 1993.

Robert B. Stringer, Cyril & Crowley, San Francisco, CA, for plaintiff-appellant.

Arthur J. Shartsis, and Tracy L. Salisbury, Shartsis, Friese & Ginsburg, San Francisco, CA, for defendant-appellee.

Before: CANBY, REINHARDT and LEAVY, Circuit Judges.

CANBY, Circuit Judge:

The Olympic Club appeals the district court's grant of summary judgment to its insurer, Lloyd's,[1] holding that Lloyd's was not liable under the Club's insurance policy for the defense costs associated with race and gender discrimination suits brought against the Club by the City and County of San Francisco ("the City"). We affirm.

## BACKGROUND

### A. *The Underlying Lawsuits*

The Olympic Club operates an indoor athletic, dining, recreational, residential, and health facility in downtown San Francisco and a 364-acre country club in Lakeside, San Francisco. From its founding in 1860, the Club restricted its membership to "only white male citizens of the United States." Even in the face of community pressure, threatened lawsuits, and the resignation of prominent Club members, the Club's Board of Directors voted in 1967 to retain its discriminatory membership policies. In 1968, however, the Club formally ended its policy of racial discrimination. The Club continues expressly to exclude women from membership. In addition, the practice of excluding African–Americans from membership allegedly has continued informally. Although African–Americans have applied or expressed interest in obtaining full membership in the Club, none of the Club's 4,000 members is black.

On June 26, 1987, the San Francisco City Attorney warned the Club that she had information indicating that the Club's membership policies violated California's Unruh Civil Rights Act, Cal.Civ.Code § 51 *et seq.*, and constituted a breach of the Club's lease with the City.[2] Several months of settlement negotiations resulted in the Club's Board of Directors voting to recommend to the membership a series of proposals designed to eliminate formal and informal discrimination against women and African–Americans. The proposals included expedited membership procedures for women and African–Americans, construction of athletic and bath facilities for women, and reporting and compliance requirements. The City Attorney recognized in a letter to the Club's president on September 10, 1987 that "adoption of these policies is subject to approval by the Club's membership."[3] On October 7, 1987, the Club's membership voted to reject the Board's proposals.

The City filed suit in state court against the Club and fifty unidentified defendants[4] ("the Doe Defendants") on November 2, 1987, seeking injunctive relief under the Unruh Act and claiming a breach of the lease. The complaint's first cause of action alleges that

[b]y prohibiting women and minorities from joining The Olympic Club as full, active members, defendants have deprived such persons of accommodations, advantages, facilities, privileges and ser-

1. The defendants/appellees are all underwriters and insurance companies doing business in the London Market that subscribed to insurance policy No. NP 00400, the policy that provides directors and officers liability insurance to The Olympic Club. *For convenience, we refer to* defendants/appellees collectively as "Lloyd's."

2. The Club's golf courses are located, in part, on land leased from the City. The lease permits the use of the City's property "provided that such use shall not create a nuisance or violate any laws or governmental orders now or hereafter enacted." The Club agreed in the lease to conduct its operations "in strict compliance with all laws of the United States, the State of California, applicable laws of the City and Coun-

ty of San Francisco and San Mateo County, or any legal authority having jurisdiction over same, and all rules and regulations issued pursuant to the laws of the sovereignties or agencies hereinabove mentioned."

3. The Club's Board of Directors is authorized to amend the Club's bylaws, but it must submit any amendment to a full membership vote upon a demand by five percent of the Club's members.

4. *California's Code of Civil Procedure permits* plaintiffs to give fictitious names in their pleadings for unidentified defendants. Cal.Civ.Proc. Code § 474.

vices on the basis of sex, race, color and national origin, in violation of the Unruh Civil Rights Act.

... Defendants' wrongful conduct is continuing in that The Olympic Club persists in denying persons, on the basis of sex or race, the full and equal accommodations, advantages, facilities, privileges, and services of [the Club].

... By discriminating against persons on the basis of race or sex, defendants have engaged, and continue to engage, in a pattern or practice of resistence [sic] to the full enjoyment of rights secured by the Unruh Civil Rights Act, and defendants intend this pattern or practice to deny the full exercise of such rights.

The second cause of action alleges that "[i]n material breach of [the lease], defendant The Olympic Club has discriminated against persons on the basis of race, sex, color and national origin in violation of applicable law." The third cause of action seeks a declaration that the Club breached the lease, and the fourth cause of action seeks the Club's ejectment from the leased lands.

The City filed a second lawsuit in state court against the Club on February 9, 1989, seeking injunctive and declaratory relief for alleged violations of Article 33B of the San Francisco Municipal Code.[5] The second complaint alleges that

[d]efendants have denied to women and minorities entry to or use of the Club's facilities on the same terms as white males; defendants have denied to women and minorities full membership in the Club; and defendants have denied to women and minorities the full enjoyment of the Club on the basis of sex, race, creed, color, ancestry, or national origin.

Both of the City's complaints seek declarations that the Club's discriminatory acts are unlawful, and injunctive relief ending the Club's discrimination on the basis of race and gender and requiring the Club to take immediate steps to correct the effects of its discriminatory policies and practices.

## B. *The Insurance Policy*

Lloyd's issued "Director's and Officer's Liability Including Organization Reimbursement Policy" No. NP 00400 to the Club in 1982 and renewed the policy for a three-year term on March 5, 1985.[6] The "Insuring Clause" of the policy requires Lloyd's to pay (1) all "loss" that arises from claims made against the Club's directors and officers during the term of the policy for "wrongful acts," and (2) all "loss" for which the Club is obligated to indemnify the directors and officers for claims made during the term of the policy. Endorsement # 1 of the policy extends coverage to the Club's employees. Endorsement # 2 further extends coverage to include any "loss ... arising from [a] claim or claims made against [the Club] but only in respect of wrongful act [sic] done or allegedly done by the directors, officers, and/or employees which acts are imputed to the organization as their principal."

The policy defines "loss" as

any amount which the Directors and Officers are legally obligated to pay or for which [the Club] is required or permitted by law to pay as indemnity to the Directors and Officers, for a claim or claims made against the Directors and Officers for Wrongful Acts and shall include but not be limited to damages, judgments, settlements and costs, [and] costs of investigation and defense of legal actions ... provided always, however, such subject of loss shall not include fines or penalties imposed by law, or matter which are uninsurable under the law pursuant to which this policy shall be construed.

The policy defines "wrongful act" to be "any actual or alleged error or misstatement or misleading statement or act or

---

**5.** Section 3300B.3 of the Code declares that [i]t shall be unlawful for a club which is not distinctly private to deny to any person entry to or use of facilities at, membership in, or unreasonably prevent the full enjoyment of said club on the bases of sex, race, creed, color, religion, ancestry, national origin, sexual orientation, or disability.

**6.** The parties agree that the City's suits against the Club were filed during the term of the policy.

omission or neglect or breach of duty by the Directors and Officers in the discharge of their duties, individually or collectively, or any matter claimed against them solely by reason of their being Directors or Officers of [the Club]."

## C. *The District Court's Decision*

Soon after the City filed its complaints, the Club tendered the actions to Lloyd's and requested that it pay all defense costs as they were incurred. Lloyd's refused. The Club filed suit in the United States District Court for the Northern District of California, alleging breach of contract and bad faith refusal to pay insurance benefits. The Club's complaint requested both declaratory relief and damages. Lloyd's answered and filed a counterclaim seeking a declaration that the Club was not covered under the policy. Both parties filed summary judgment motions.

The district court granted Lloyd's' motion and denied that of the Club. The court interpreted the policy as expressly conditioning Lloyd's' obligation to pay for defense costs "upon the existence of claims [in the underlying suit] against the directors for 'wrongful acts.' " The court found no such claims in the City's complaints. The Club now appeals.

## DISCUSSION

We review *de novo* the district court's grant of summary judgment to Lloyd's. *Jones v. Union Pac. R.R.*, 968 F.2d 937, 940 (9th Cir.1992).

## I

■ Stripped to its essentials, the issue in this case is whether the underlying lawsuits are against the Club for the Club's own policies, or are against the Club because of "wrongful acts" of its directors and employees that are "imputed to [the Club] as their principal." In our view, the City's claims for injunctive and declarative relief are clearly based on the Club's own policies; it is the policies of the Club itself that are sought to be enjoined and declared unlawful. It is the Club that is claimed to have breached its lease. The Club is not

being sued for some "wrongful act" of its directors or employees that is "imputed to the [Club] as principal." Accordingly, the defense costs for the state litigation do not qualify as "losses" covered by Endorsement # 2 of the policy. The policy, after all, is a Directors' and Officers' liability policy with an endorsement protecting the Club; it is not an expanded comprehensive liability policy insuring the Club against liability for everything it does.

The Club contends, however, that a claim of unlawful discrimination by the Club *necessarily* constitutes a claim against its directors, officers or employees because those are the only instruments through which a club can act. This argument fails for three reasons. First, the Club need not act only through its directors, officers and employees. It can also act through its members. Indeed, the *sine qua non* of the City's claims against the Club was the act of the membership in rejecting, in 1987, the Board's proposal to end the policies of discrimination. Unlike directors, officers, and employees, however, members and their acts are not covered by Lloyd's' policy.

Second, the Club's discriminatory membership policies have apparently existed for more than one hundred and thirty years. The Club is undoubtedly correct in its assertion that *"someone* has to be responsible for such discrimination"; nonetheless, nothing in the City's complaint or the Club's by-laws establish how the policies were created or who created them. The Club cannot satisfy its burden without showing a factual allegation in the City's complaints that directors, officers, or employees created or enforced the discriminatory policies.

■ Third, Endorsement # 2 extends coverage only to "wrongful act[s] done or allegedly done by the directors, officers, and/or employees *which acts are imputed to [the Club] as their principal.*" (Emphasis added.) The phrase "imputed to [the Club] as their principal" clearly limits coverage to instances when the directors, officers, and employees have acted as agents for the Club and committed wrongful acts for which the Club is held vicari-

ously liable.[7] The Club's argument reduces to the assertion that the policy covers the Club's wrongful acts, as though the Club were the directors' agent. If this interpretation governed, the Club's directors, officers, and employees would be liable for every corporate act undertaken by the Club and Lloyd's would be obligated to pay defense costs for *every* suit against the Club. This argument defies any reasonable interpretation of Endorsement # 2 and the unmistakable purpose of a directors and officers liability insurance policy. It also turns on its head California's rule that directors are the agents of their corporation. *See* Cal.Corp.Code § 317(a).

◼ The Club next contends that the complaints in the underlying litigation actually do allege "wrongful acts" by directors, officers or employees. In arguing that point, the Club first relies on the fact that the allegations include 50 "Doe Defendants" and the allegations of discrimination are alleged to have been the acts of the plural "defendants." But the allegations are that the defendants carried out the Club's policies of discrimination; they do not allege wrongful acts of the directors, officers, or employees that would render them liable in a way that would be imputed to the Club. While the City's complaints identify all the defendants, including the Doe defendants, as the "agent, servant, or employee" of the other defendants, this ambiguous designation does not establish that the Doe defendants are directors, officers, or employees of the Club covered by the policy. Further, even assuming the Doe defendants are directors, officers, or

employees of the Club, the City's complaints do not allege that the Doe defendants are liable for any discriminatory act or omission.

◼ The Club relies on the second complaint's allegation that "[d]efendants have denied to women and minorities entry to or use of the Club's facilities on the same terms as white males." The Club must demonstrate that the City's complaint alleges *facts* that give rise to potential liability for directors, officers, or employees under the Unruh Act or the San Francisco Municipal Code. *Saylin v. California Ins. Guarantee Ass'n*, 179 Cal.App.3d 256, 224 Cal.Rptr. 493, 497 (1986);[8] *CNA Casualty of Cal. v. Seaboard Sur. Co.*, 176 Cal. App.3d 598, 222 Cal.Rptr. 276, 279 (1986); *Previews, Inc. v. California Union Ins. Co.*, 640 F.2d 1026, 1027–28 (9th Cir.1981) (applying California law); *see also Centennial Ins. Co. v. Applied Health Care Sys.*, 710 F.2d 1288, 1291 (7th Cir.1983) (same). This bare allegation does not establish that the Club's directors, officers, or employees are potentially liable for discriminatory acts. Rather, it merely tracks the language of section 3300B.3 of the San Francisco Municipal Code.[9]

◼ The City did refer in its first complaint to the Board's unanimous vote in 1967 to retain the Club's discriminatory membership policies. The City made this allegation in the section of the complaint providing historical background for the Club's existing policies.[10] We do not read the City's complaint as alleging any cause of action, actual or potential,[11] against the

---

7. The Club argues that the word "imputed" is ambiguous and, therefore, its interpretation should govern. Webster's Third New International Dictionary defines "imputed" to mean: **1 a:** to attribute accusingly: lay the responsibility or blame for sometimes falsely or injustly ... **b:** to credit or ascribe to a person or a cause ... **c:** to make a legal imposition of ... **d:** to credit by transferal ... to the account of someone other than the initiating agent **2:** reckon, consider, regard **3:** impart, give ... **4:** to charge someone with wrongdoing or crime **syn** see ascribe. *Webster's Third New International Dictionary Unabridged* at 1139 (G. & C. Merriam Co. 1976). We find no ambiguity given the context in which "imputed" is used in the policy.

8. We need not look beyond the complaint and the Club's by-laws because the Club does not allege that Lloyd's is aware of any other facts that might give rise to the possibility that directors, officers, or employees are liable.

9. See note 5 *supra.*

10. The second complaint makes no mention of the 1967 vote.

11. Any claim against the directors for action taken in 1967 would face the three-year statute of limitations governing claims under the Unruh Act. *See* Cal.Civ.Proc.Code §§ 312, 338 (statute of limitations for actions based on statu-

directors who cast their votes in 1967.[12] Nor is the 1967 vote alleged to have done anything but maintain, for the Club, its existing policy. As the district court correctly pointed out, California corporate law does not extend liability to directors, officers, and employees merely based on their status. *See United States Liab. Ins. Co. v. Haidinger–Hayes, Inc.*, 1 Cal.3d 586, 83 Cal.Rptr. 418, 423, 463 P.2d 770 (1970). The California Supreme Court observed in a more recent case:

> Virtually any aspect of corporate conduct can be alleged to have been explicitly or implicitly ratified by the directors. But their authority to oversee broad areas of corporate activity does not, without more, give rise to a duty of care with regard to third persons who might foreseeably be injured by the corporation's activities.

*Frances T. v. Village Green Owners Ass'n*, 42 Cal.3d 490, 229 Cal.Rptr. 456, 465, 723 P.2d 573 (1986); *see also Ruocco v. Bateman, Eichler, Hill, Richards, Inc.*, 903 F.2d 1232, 1240 (9th Cir.) (directors not liable absent evidence that they acted personally or that the decision was not a corporate act), *cert. denied*, 498 U.S. 899, 111 S.Ct. 254, 112 L.Ed.2d 212 (1990). Thus, the fact that the Club's by-laws vest the Board of Directors with the authority to change the by-laws does not establish the directors' potential liability. The Club must show that the City alleges that a director, officer, or employee specifically authorized, directed or participated in the Club's discriminatory acts and thereby breached a duty owed to the City and the public at-large. *See Frances T.*, 229 Cal. Rptr. at 466–67, 723 P.2d at 583–84; *United States Liab.*, 83 Cal.Rptr. at 423, 463 P.2d at 775. There has been no such showing.

In response to all these points, the Club argues strongly that we are construing the insurer's duty far too narrowly to comply with governing California law. The Club relies heavily on *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168 (1966). The insurer in *Gray* had issued a comprehensive personal liability policy to the insured that included a "duty to defend." The insured tendered an assault suit to the insurer pursuant to a provision in the policy requiring the insurer to "defend any suit against the insured alleging ... bodily injury or property damage...." *Id.*, 54 Cal.Rptr. at 106, 419 P.2d at 170. The insurer refused to provide a defense, citing an exclusionary clause excepting from its duty to defend any "bodily injury or property damages caused intentionally by or at the direction of the insured." *Id.* The California Supreme Court concluded that the contradictory coverage and exclusionary clauses created an ambiguity that had to be resolved in a manner that satisfied the insured's objectively reasonable expectations. *Id.* at 110–11, 419 P.2d at 174–75. The court concluded that the insured could have reasonably expected coverage under the policy and, therefore, the insurer was obligated to defend the insured's assault suit.

■ This case differs from *Gray*. The Club's policy does not impose a duty to defend on Lloyd's. Rather, the policy requires only that Lloyd's pay the costs of defending particular lawsuits brought against the Club's directors and officers. *See Gon v. First State Ins. Co.*, 871 F.2d 863, 867–68 (9th Cir.1989) (contrasting a duty to defend with a duty to pay defense costs). This distinction determines which party bears the burden of proof. The insurer bears the burden of proving that a potential claim covered by the duty to defend falls within an exclusionary clause. *Royal Globe Ins. Co. v. Whitaker*, 181 Cal.App.3d 532, 226 Cal.Rptr. 435, 437 (1986). Since the dispositive question in this case concerns the scope of the Club's basic coverage under the policy, however, the Club bears the burden of establishing Lloyd's' obligation to pay the Club's defense costs under the policy. *Chamberlain v. Allstate Ins. Co.*, 931 F.2d 1361,

---

tory liability is three years "after the cause of action shall have accrued").

**12.** The policy provides coverage for "all persons who were, now are, or shall be Directors and Officers of the Organization...."

1364 (9th Cir.1991); *see also Dyer v. Northbrook Property and Casualty Ins. Co.*, 210 Cal.App.3d 1540, 259 Cal.Rptr. 298, 302 (1989) (distinguishing *Gray* ); *Giddings v. Industrial Indem. Co.*, 112 Cal. App.3d 213, 169 Cal.Rptr. 278, 280 (1980) (same). The Club's burden is to show that the City's complaint *"potentially* seeks damages within the coverage of the policy." *Gray*, 54 Cal.Rptr. at 112, 419 P.2d at 176 (emphasis in original); *see also Safeco Ins. Co. of America v. Andrews*, 915 F.2d 500, 502 (9th Cir.1990) (citing *Gray* ). The Club has shown no potential claim based on the wrongful act of a director, officer or employee imputed to the Club as principal.

This case also differs from *Gray* in that it does not center on an ambiguity created by conflicting coverage and exclusionary clauses. The dispositive question here is the scope of Endorsement # 2 informed by the policy's definitions of "loss" and "wrongful acts." Thus, the Club must show that the language of Endorsement # 2 is ambiguous before the Club's expectations of coverage become relevant to the interpretation of the policy. *Chamberlain*, 931 F.2d at 1366. In the absence of any ambiguity, the mutual intentions of Lloyd's and the Club at the time of the policy's creation govern the interpretation of the policy. *See AIU Ins. Co. v. Superior Court (FMC Corp.)*, 51 Cal.3d 807, 274 Cal.Rptr. 820, 831, 799 P.2d 1253 (1990). This intent is derived from the clear and explicit meaning of the terms in Endorsement # 2 and the definitions of "loss" and "wrongful act" interpreted in their ordinary and popular sense. *Id.*

Finally, the phrases contained in Endorsement # 2 must be interpreted in light of the policy's general purposes. *See Gray*, 54 Cal.Rptr. at 109, 419 P.2d at 173. In *Gray*, the insured had purchased a "comprehensive personal liability" policy entitling him to wide coverage. *Id.* at 109–10, 419 P.2d at 173–74. The Club purchased a "directors and officers" liability policy; therefore, the phrases contained in Endorsement # 2 and the definitions section of the policy must be interpreted to insure against liability imposed on the Club's directors and officers, which is then imputed to the Club.

■ The Club further argues that the City could easily amend its complaint to allege wrongful acts by the directors and officers that would subject them to liability. Only amendments that would include new *causes of action* clearly supported by the facts already pled in the complaint may support a finding of potential liability. *See, e.g., Gray*, 54 Cal.Rptr. at 113, 419 P.2d at 177; *Allstate Ins. Co. v. Gilbert*, 852 F.2d 449, 452–53 (9th Cir.1988). Mere speculation that the City will allege *new facts* in its suit against the Club cannot satisfy the Club's burden of proof in this case. *Lassen Canyon Nursery, Inc. v. Royal Ins. Co. of America*, 720 F.2d 1016, 1018 (9th Cir.1983) (citing *Giddings*, 169 Cal.Rptr. at 282); *see also National Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir.1983) (mere possibility of a factual dispute insufficient to defeat summary judgment); *Neely v. St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341, 344 (9th Cir.1978) ("An opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify denial of the [summary judgment] motion").

We conclude that the district court did not err in granting summary judgment to Lloyd's on the ground that the policy does not cover the City's actions against the Club.[13]

## II

The Club argues that the district court's order unconditionally granting summary judgment to Lloyd's overreaches by holding that the Club is not entitled to "any" coverage under the policy now or in the future, no matter what unforeseen developments might occur in the underlying litigation. We do not read the district court's memorandum and opinion so expansively.

---

**13.** In light of this conclusion, we need not reach Lloyd's' alternative argument that section 533 of the California Insurance Code prohibits insur-

ing against the losses associated with intentional discriminatory acts.

The cross-motions for summary judgment upon which the district court ruled depended on the facts *as they now stand.* The district court could not, and in our understanding did not, rule on an unknown set of facts that may or may not arise in the future. Issues relating to Lloyd's' future responsibilities to pay defense costs in such speculative circumstances are not ripe.

## CONCLUSION

The district court's grant of summary judgment to Lloyd's is AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

Because I believe the majority misconstrues both the City's claims against the Olympic Club and the second endorsement to the Club's insurance policy, I dissent.

## I

This is a simple coverage dispute between insurer and insured. The rules for adjudicating such a dispute are well-established, and the repugnancy of the acts allegedly committed by the insured cannot alter these principles. A quick review of these adjudicative guidelines exposes the full import of the majority's conclusion that Lloyd's is not liable for the Club's defense costs.

First, we are constrained to favor the Club, as the insured, in interpreting the policy at issue. That we resolve uncertainties in favor of the insured is an undeniable axiom of policy interpretation. "In interpreting an insurance policy we apply the general principle that doubts as to meaning must be resolved against the insurer." *Gray v. Zurich Ins. Co.,* 65 Cal.2d 263, 269, 54 Cal.Rptr. 104, 107, 419 P.2d 168, 171 (1966); *see also Eichler Homes, Inc. v. Underwriters at Lloyd's,* 238 Cal.App.2d 532, 538, 47 Cal.Rptr. 843, 847 (1965) ("[w]here there is doubt as to whether the duty to defend exists, the doubt should be resolved in favor of the insured"). "Moreover, coverage clauses are to be interpreted broadly so as to afford the greatest possi-

ble protection to the insured." *Safeco Ins. Co. of America v. Andrews,* 915 F.2d 500, 502 (9th Cir.1990) (*citing Reserve Ins. Co. v. Pisciotta,* 30 Cal.3d 800, 808, 180 Cal. Rptr. 628, 640 P.2d 764 (1982)).

Second, in order to prevail, the Club need not demonstrate actual or even probable covered losses; it need only show *potential* covered losses. "[T]he carrier must defend a suit which *potentially* seeks damages within the coverage of the policy." *Gray,* 65 Cal.2d at 275, 54 Cal.Rptr. at 112, 419 P.2d at 176. "[T]here exists a duty on the insurer to *defend* an action if potential liability to pay exists, even though that potential liability to pay is remote." *California Union Ins. Co. v. Club Aquarius, Inc.,* 113 Cal.App.3d 243, 247, 169 Cal.Rptr. 685, 686 (1980).

Finally, the duty to pay defense costs cannot rest solely upon an examination of the pleadings. "The insurer's obligation to defend is not dependent on the facts contained in the complaint alone; the insurer must furnish a defense when it learns of facts from *any* source that create the potential of liability under its policy." *CNA Casualty of Calif. v. Seaboard Surety Co.,* 176 Cal.App.3d 598, 606, 222 Cal.Rptr. 276, 279 (1986). Moreover, while the insurer cannot hide *behind* the pleadings, it also cannot hide *from* them by appealing to facts not in the pleadings. "[T]he duty to defend is so broad that as long as the complaint contains language creating the potential of liability under an insurance policy, the insurer must defend an action against its insured even though it has independent knowledge of facts not in the pleadings that establish that the claim is *not* covered." *Id.*

Despite these three established principles favoring insureds in coverage disputes of this nature, the majority holds that the insurer is entitled to summary judgment. In effect then, the majority determines that, considering the City's pleadings and extrinsic facts in the light most favorable to the Club,[1] and ignoring extrinsic facts

---

1. For purposes of the action before us, the light most favorable to the Club is the light which in

the underlying actions is most favorable to the City. In other words, we look at the facts and

favorable to Lloyd's, the policy and endorsement unambiguously preclude even the remote potential of coverage for losses under the City's complaints. I cannot join this extraordinary conclusion. I believe that a fair and logical interpretation of the City's complaints raises a clear and evident potential for covered losses.

## II

As an initial matter, it should be apparent that the Unruh Act and Article 33B of the San Francisco Municipal Code prohibit *acts* of discrimination. An unenforced *policy* of racial or gender discrimination without more, while certainly repugnant, is not actionable.[2] If, for example, the Olympic Club, without repealing its stated policy of excluding women, changed its practices and openly admitted women to full membership on the same basis as men, it is highly unlikely the City Attorney could successfully pursue an action for gender discrimination against the Club. Mere policy pronouncements, without concomitant acts to enforce them, are not proscribed.

Thus, when the majority asserts that this case reduces to a determination whether the underlying lawsuits are based upon "policies" or "wrongful acts," it creates a false dichotomy. We must assume that the City's actions are valid. *Policies* alone cannot support the lawsuits, *acts* are necessary underpinnings of the City's claims against the Club. Here, *acts* serve to implement *policies*. Thus, it is both *acts and policies* that bring the City's claims directly within the coverage of the second endorsement.

## A

The vast majority, if not all, of the discriminatory *acts* supporting the City's lawsuits—including denial of membership and denial of access to women and minorities—were necessarily performed by directors, officers, and employees (including committee chairmen)[3] of the Club. These acts by the directors, officers, and employees "in the discharge of their duties" fall within the definition of "wrongful act" under the Club's insurance coverage. That these wrongful *acts* of discrimination were committed in furtherance of a Club *policy* of racial and gender discrimination renders them no less an indispensable part of the City's claims against the Club.

As noted above, the potential for coverage does not depend upon specific factual allegations within the complaint. An insurer is required to provide a defense when "facts from *any* source" reveal potential coverage. *CNA Casualty*, 176 Cal.App.3d at 606, 222 Cal.Rptr. at 279. The sketchiness of the City's complaints cannot deprive the Club of its rights as an insured. If the rule were otherwise, any litigant could, by artful construction of its pleadings, preclude its opponent's insurance coverage and thereby obtain a tremendous litigation advantage. "[W]e should hardly designate the third party as the arbiter of the policy's coverage." *Gray*, 65 Cal.2d at 276, 54 Cal.Rptr. at 112, 419 P.2d at 176. Thus, the majority's narrow and near-exclusive focus upon the specific factual allegations in the City's complaints is inconsistent with California law.

Admittedly, the City's complaints, as is the case with most modern pleadings, are somewhat sketchy. Here, it is possible

---

inferences in the manner which subjects the Club to the widest exposure.

**2.** Of course, a formal or informal policy of discrimination could so discourage members of the groups discriminated against that they never seek the benefit to which the discriminatory policy applies. In such circumstances, it is possible that the policy alone could support an actionable claim under the Unruh Act. However, at least with regard to African Americans, that is not the case here; as the majority notes, some African Americans have applied for or

expressed interest in obtaining full membership in the Club. Moreover, even where a policy is so effectively discouraging as to obviate the need for direct acts of discrimination, someone must disseminate the policy in order for it to have its intended effect. If directors, officers or employees accomplish such dissemination, they engage in wrongful acts supporting the policymaker's Unruh Act liability.

**3.** Under the third endorsement to the policy, the term "employee" includes committee chairmen.

that the City deliberately made its complaints as fact-bare as possible. Nonetheless, on their face, both complaints allege a "pattern or practice" of discrimination. Because I view the charge of consulting "*any* source" as including the logical and fair import of the words pleaded, I fail to see how this phrase can suggest anything but *acts* by the Club's officers, directors, employees, and committee chairmen. The "practice" of discrimination necessarily includes actions. Moreover, the City's complaints do not rely simply upon denial of membership; they allege denial of equal access to the Club's accommodations separate and apart from exclusion from membership. The underpinnings of this allegation must consist of specific acts by the Club's employees. Even if the City, for whatever reason, has failed to detail these specific acts in its pleadings, Lloyd's and the court cannot deny that the claim is in respect of "wrongful acts" by Club employees.

Such a denial defies logic and common sense. Policies, particularly those like the Club's which have been in existence for over 130 years, depend upon *acts* to enforce them. Even discriminatory policies so widely known as to discourage any challengers depend upon acts of dissemination to achieve their unlawful deterrence. That a 130–year old policy depends upon acts of enforcement by directors, officers, and employees is an obvious, logical inference that we cannot ignore. In determining potential coverage based upon brief and undetailed pleadings, California law neither requires nor allows us to ignore common sense.

Even if I were to conclude that more specific factual allegations are required, I would find them present here. The City's claims raise another obvious potential for covered losses. In 1987, the Club's Board of Directors submitted to the membership a series of proposals to eliminate discrimination. This submission was an *act* by the directors; it is also a factual allegation in the City's first complaint. As the majority acknowledges, the Board had the power to change the bylaws of its own accord, subject to a demand for a full membership vote by five percent of the members. In-

stead of adopting amendments terminating the discriminatory policies, the directors submitted amendatory proposals directly to the membership, which defeated them. This discretionary submission to the membership prior to demand is an "act" by the directors, leading directly to the City's claims. It is an act that presents a potential for coverage under the second endorsement.

In addition, the directors had a *duty* to exercise their power to change the Club's policies and practices to bring the Club into compliance with state and municipal law. Their failure to so act, in and of itself, supports the potential for coverage under the second endorsement. The policy definition of "wrongful act" includes any "omission." Had the directors not omitted to change the Club's policies and practices, the City would have no claims. Thus, the directors' omission is a "wrongful act" bringing the City's claims against the Club potentially within the coverage of the second endorsement.

Thus, as I read the City's complaints, keeping in mind the general principles of policy interpretation detailed above, they clearly convey that *acts* by directors, officers, employees, and committee chairmen underlie the claims.

**B**

The Club's discriminatory *policies* are highly relevant to the City's claims. As to the City's lawsuits, the policies are highly probative of *intentional* discrimination. As to our inquiry here, the policies demonstrate why the discriminatory *acts* of the Club's officers and employees are imputed to the Club itself. As the majority notes, the second endorsement extends coverage to losses from claims against the Club for acts done by the directors, officers, or employees that "are imputed to the organization as their principal." To my knowledge, there is no more obvious manifestation of an agent acting on behalf of a principal than when an employee—or director or officer—commits *acts* in furtherance of a *policy* established by his employer.

Thus, the majority's contention that the Club's argument for coverage "turns on its head California's rule that directors are the agents of their corporation" is entirely incorrect. Rather, a straightforward application of California's rule requires us to recognize that the claims alleged in the City's complaints fall within the second endorsement. Discriminatory *acts* by the directors, officers, and employees are imputed to the Club, as their principal, because it established the discriminatory *policy* to be followed by its agents.

The majority, refusing to recognize that discriminatory policies, including recent ratifications by the membership, *support* the potential for coverage under the second endorsement, appears to conclude that the existence of these policies somehow requires us to ignore the *acts* by directors, officers, employees, and chairmen that obviously underlie the City's claims. This erroneous view seems to stem from two misconceptions.

First, the majority repeatedly notes the absence of causes of action or alleged liability against the officers or directors. The district court also based its decision in part upon the absence of a claim against an officer or director. The existence of a legal claim—or the viability of a possible claim—against an officer or director is not germane to coverage under the policy's second endorsement. The policy definition of "wrongful act" does not require a legal claim or even a potential claim against the person who engages in the act. Rather, the second endorsement specifically reaches claims *against the Club* for acts done by the officers and directors; nothing suggests that those acts need support independent liability on the part of the directors or officers. Thus, the majority's discussion of impediments to personal liability of the directors, officers, and employees is ultimately irrelevant.

Moreover, even if potential liability of the individual actors were requisite to application of the second endorsement, the majority's assumption that the existence of the Club's policies obviates such personal liability is simply wrong. Following policy set by another, even if the policymaker is one's employer, does not endow a wrongdoer with personal immunity from liability. Such policies may allow the wrongdoer to seek indemnity from the policymaker, but "I was simply carrying out policy" is no defense to a claim of discrimination brought by an injured party.[4] Thus, the 1987 membership ratification of continued policies of discrimination does not shield the wrongful acts of directors, officers, and employees; we cannot ignore the potential for coverage created by these acts simply because of member ratification or policymaking.

The City's claims depend upon both acts and policies. The existence of one does not cancel the other. Acts and policies together raise the evident potential for losses covered under the second endorsement.

### C

By this simple logical calculus, we should reverse the district court's judgment. As discussed previously, under traditional interpretive principles, in order to affirm the district court, we must conclude that the second endorsement unambiguously precludes any potential for coverage of the City's claims. Nonetheless, in the face of such longstanding doctrine requiring us to favor the insured, the majority reaches just such a strained conclusion to hold in favor of the insurer. I, for one, fail to see the clear and unambiguous meaning of the second endorsement that the majority attaches to it.

Perhaps the majority's decision is related to the Club's unsympathetic stance in the City's litigation as a defender of discrimination. Lloyd's argues that we should affirm

---

**4.** This explains why the majority's discussion of the Doe defendants is unconvincing. While my dissent focuses upon the second endorsement, there remains the potential for coverage under the original policy for the claims against the Doe defendants, if some of them happen to be directors, officers, employees, or committee chairmen. The discussion of "acts" above should make clear that most, if not all, of the Does are likely to be such officers, directors, or employees.

because "[i]t would be contrary to public policy to have insurance coverage that encourages the insured to continue to discriminate." However, despite a surface appeal, the majority's strained construction of the second endorsement provides limited service to the cause of eliminating policies of discrimination at clubs like the Olympic Club.

Insurers are sophisticated business entities. Were we to reach the correct result—dictated both by precedent and a fair reading of the second endorsement—insurers could, if they wish, move swiftly to exclude, explicitly, acts of discrimination from liability coverage issued to clubs like the Olympic Club. This result, I am confident, would lead such clubs to abandon policies of discrimination far more quickly than piecemeal imposition of defense costs on individual discriminatory clubs by courts intent on imposing strained readings on unambiguous insurance policy language. In any event, the cost of such an approach to the laudable goal of eliminating discrimination at such clubs is the perversion of insurance law as it affects all insureds. That is a price we, as interpreters of California law, have no right to pay.

I would reverse the district court's judgment.